ORDERED.

**Dated: June 22, 2020**

*Caryl E. Delano*
Caryl E. Delano
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:                                               Case No. 9:19-bk-06350-FMD
                                                     Chapter 13
Thomas Errico,

    Debtor.
_____/

**MEMORANDUM OPINION
(1) DENYING MOTION TO MODIFY PLAN TO ABATE PAYMENTS,
(2) GRANTING MOTIONS FOR RELIEF FROM STAY, AND (3) DISMISSING CASE**

THIS CASE came on for hearing on May 14, 2020, and May 28, 2020, on *Debtor's Verified Motion to Modify Plan to Abate Payments* (the "Abatement Motion"),[1] and the objections to the Abatement Motion and expedited motions for relief from stay filed by Larry L. Russ as Trustee ("Russ"),[2] Raymond Ragusa ("Ragusa"),[3] and DLP Lending Fund, LLC ("DLP")[4] (collectively, "Creditors"). The objections and motions filed by Russ, Ragusa, and DLP are collectively referred to as the "Stay Motions."

---

[1] Doc. No. 99.
[2] Doc. No. 103.
[3] Doc. No. 104.
[4] Doc. No. 112.

The Court has carefully considered the motions and record, and finds, first, that cause exists under 11 U.S.C. § 362(d)(1)[5] to grant the Stay Motions; and second, that Debtor is unable to satisfy the good faith requirements to confirm a Chapter 13 plan under §§ 1325(a)(3) and 1325(a)(7). Therefore, the Court will deny the Abatement Motion, grant the Stay Motions, and dismiss the case.

**A.   Debtor's History of Filing Bankruptcy Cases**

Debtor is very familiar with the bankruptcy court, having filed a total of nine bankruptcy cases between 2008 and 2019. In 1992, Debtor filed a Chapter 7 bankruptcy case in the District of Massachusetts and received a discharge.[6] Debtor's later bankruptcy cases, all filed under Chapter 13 in the Middle District of Florida, are as follows:

1. Case No. 9:08-bk-17108-ALP, filed on October 30, 2008, and dismissed on February 17, 2009, for failure to make pre-confirmation Chapter 13 plan payments.

2. Case No. 9:09-bk-07021-BSS, filed on April 10, 2009, and dismissed on July 10, 2009, by order granting Debtor's motion to dismiss. Debtor sought the voluntary dismissal after objections to confirmation or motions to dismiss were filed by three creditors and the Chapter 13 Trustee.

3. Case No. 9:09-bk-19474-ALP, filed on August 31, 2009, and dismissed on November 24, 2009, for failure to comply with the Court's First Day Order establishing the duties of Debtor.

4. Case No 9:09-bk-29227-ALP, filed on December 23, 2009, and dismissed on March 23, 2010, for failure to file required documents. The order of dismissal includes a two-year bar against re-filing another bankruptcy case.

---

[5] Unless otherwise stated, statutory references are to the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*
[6] Case No. 92-18548 (District of Massachusetts).

5.      Case Number 9:13-bk-12065-FMD, filed September 11, 2013, and dismissed on October 4, 2013, for failure to file bankruptcy schedules.

6.      Case Number 9:14-bk-06449-FMD, filed on June 2, 2014, and dismissed on January 30, 2015, for failure to comply with the Court's First Day Order.[7]

7.      Case Number 9:15-bk-03583-FMD, filed on April 7, 2015, and dismissed on April 22, 2015, for failure to file bankruptcy schedules.

8.      Case No. 9:19-bk-05373-FMD, filed on June 5, 2019, and dismissed by an order entered on June 26, 2019, effective July 11, 2019, for failure to file bankruptcy schedules.

Debtor filed his most recent Chapter 13 bankruptcy on July 3, 2019, before the order dismissing the prior case became effective. Only his two most recent cases have affected Creditors.

**B.     Creditors' Loans**

The history of Creditors' loans, as evidenced by documents filed in the Official Records of Lee County, Florida, is as follows:

*1.     The Russ Loan*

In February 2016, Russ made a loan in the amount of $65,000.00 to Marketking, LLC, a Florida limited liability company in which Debtor claims a 100% ownership interest.[8] The loan was for the purchase of a commercial condominium located at 801 Leeland Heights Blvd. West, Unit A, Lehigh Acres, Florida ("Unit A"). On behalf of Marketking, Debtor executed a promissory note (the "Russ Note")[9] and mortgage on Unit A (the "Russ Mortgage").[10]

---

[7] An administrative notation in the docket indicates that Debtor's prior cases in 2008 and 2009 were filed "for same debtor but last four digits of SSN is off by one digit."
[8] Doc. No. 1, p. 14.
[9] Doc. No. 103, Ex. D, p. 13.
[10] Doc. No. 103, Ex. D, p. 16.

By its terms, the Russ Note matured on September 15, 2016. In his affidavit in support of his stay motion, Russ states that he made the loan based on Debtor's representation that the Russ Mortgage would be in a first lien position on Unit, but that Debtor only furnished him with copies of the Russ Note and Russ Mortgage, and did not deliver or record the original documents.[11]

Marketking did not pay the Russ Note when it matured in September 2016.[12] In February 2017, Debtor executed a warranty deed on behalf of Marketking conveying Unit A to Debtor's assistant Crystal Laguna (the "Laguna Deed"), but he did not record the deed in the public records at that time.[13] In March 2017, Marketking, through Debtor, borrowed $70,000.00 from DLP, also secured by a mortgage on Unit A. DLP recorded its mortgage (the "DLP Mortgage") in May 2017, thus obtaining the first mortgage position on Unit A.[14]

In June 2017, Debtor recorded the Laguna Deed in the public records.[15] In July 2017, Crystal Laguna signed a warranty deed conveying Unit A back to Marketking.[16]

In September 2017, Russ filed a lawsuit in Lee County Circuit Court to foreclose on the unrecorded Russ Mortgage.[17] Because Debtor was in possession of Unit A, Russ named him as a defendant in the foreclosure case. In January 2018, while the foreclosure case was pending, the deed from Crystal Laguna back to Marketking was recorded in the public records.[18] In May 2019, the Lee County Circuit Court entered a judgment of foreclosure in Russ's favor, and the foreclosure sale of Unit A was scheduled for June 7, 2019.[19]

---

[11] Doc. No. 103, Ex. A, Russ Affidavit, ¶¶ 3-6.
[12] Doc. No. 103, Ex. A, Russ Affidavit, ¶ 8.
[13] Doc. No. 103, Ex. B.
[14] Doc. No. 103, Ex. C.
[15] Doc. No. 103, Ex. B.
[16] Doc. No. 103, Ex. E.
[17] Doc. No. 103, Ex. D.
[18] Doc. No. 103, Ex. E.
[19] Doc. No. 103, Ex. F.

On June 5, 2019, two days prior to Russ's scheduled foreclosure sale, Debtor filed Chapter 13 Case No. 9:19-bk-05373-FMD. Although Debtor was neither an obligor on the Russ Note nor an owner of Unit A on June 5, 2019, he filed a "suggestion of bankruptcy" in the foreclosure case pending in the Lee County Circuit Court; the Lee County Clerk of Court cancelled the foreclosure sale.[20]

On June 14, 2019, Russ filed a motion for relief from stay in Case No. 9:19-bk-05373-FMD on the grounds that Debtor was not the owner of Unit A.[21] On June 18, 2019, Debtor, as the managing member of Marketking, executed a deed conveying Unit A to himself, which was recorded in Lee County on June 20, 2019.[22] On June 26, 2019, the Court dismissed Case No. 9:19-bk-05373-FMD due to Debtor's failure to file the required bankruptcy schedules. Because the case was dismissed, the Court did not rule on Russ's motion for relief from stay.[23]

    *2.*    *The DLP Loan*

On March 31, 2017, DLP made a loan of $70,000.00 to Marketking. On Marketking's behalf, Debtor signed a promissory note (the "DLP Note")[24] and a mortgage on Unit A to secure the DLP Note (the "DLP Mortgage").[25] The DLP Note provided for interest payments of $786.92 beginning on May 1, 2017, with the balance of principal and interest under the loan becoming due on October 1, 2017.[26] Marketking defaulted under the DLP Note and DLP Mortgage.[27]

Although Marketking was the record owner of Unit A when Debtor signed the DLP Note and the DLP Mortgage, as referenced above, on June 20, 2019, Unit A was conveyed to Debtor.[28]

---

[20] Doc. No. 103, ¶ 12.
[21] Case No. 9:19-bk-05373-FMD, Doc. No. 10.
[22] Doc. No. 1, pp. 22-23.
[23] Case No. 9:19-bk-05373-FMD, Doc. No. 11.
[24] Claim No. 13, pp. 6-11.
[25] Claim No. 13, pp. 18-32; Doc. No. 103, Ex. C.
[26] Claim No. 13, p. 6.
[27] Doc. No. 112, ¶ 8.
[28] Doc. No. 1, pp. 22-23.

### 3. *The Ragusa Loan*

In September 2013, Ragusa made a loan of $70,000.00 to Marketking. Debtor signed a promissory note on behalf of Marketking (the "Ragusa Note")[29] and a mortgage (the "Ragusa Mortgage")[30] on a commercial condominium ("Unit B"). Unit B is located in the same building complex as Unit A. The Ragusa Note provided for payments of $700.00 per month until September 1, 2015, when the entire balance of principal and interest became due. In May 2015, Marketking and Ragusa entered into a "2 Year Promissory Note Extension Agreement," that extended the maturity date of the Ragusa Note to May 1, 2017.[31]

In his motion for relief from stay, Ragusa alleges that Marketking defaulted in payments on the Ragusa Note by failing to make the payment due for September 2018 and all subsequent payments.[32] In May 2019, Debtor signed a deed on behalf of Marketking, transferring Unit B to Level 9, LLC ("Level 9"), another limited liability company owned by Debtor.[33] One month later, in June 2019, Debtor signed a deed transferring Unit B from Level 9 to Debtor.[34] The deed was recorded on June 20, 2019.

Although not relevant to the pending motions, Ragusa has filed a complaint against Debtor under § 523 to determine the dischargeability of a second mortgage loan that Ragusa made to Marketking, in connection with Marketking's acquisition of property located on 45th Street West,

---

[29] Doc. No. 104, Ex. A, pp. 1-4.
[30] Doc. No. 104, Ex. A, pp. 5-12.
[31] Claim No. 8, Ex. 2.
[32] Doc. No. 104, ¶ 2.
[33] Doc. No. 104, ¶¶ 4, 5 and Ex. B.
[34] Doc. No. 104, ¶ 6 and Ex. C.

6

Lehigh Acres, Florida. Ragusa alleges that Debtor fraudulently executed a satisfaction of this mortgage.[35]

### C. Debtor's Chapter 13 Case

As set forth above, deeds transferring Unit A from Marketking to Debtor and Unit B from Level 9 to Debtor were recorded on June 20, 2019.[36] Two weeks later, on July 3, 2019, Debtor filed his current Chapter 13 case. On his Schedule I – Income, Debtor stated that he is self-employed, that his employer is "The Sign Guy," and that he had been employed with The Sign Guy for one month. He also stated that his spouse, who is not a debtor, is a cosmetologist/hair stylist.[37]

Debtor promptly filed a motion to extend the automatic stay under § 362(c)(3).[38] Debtor also filed an initial Chapter 13 Plan that provided for Debtor to make monthly payments to the Chapter 13 Trustee, for the Russ Mortgage to be "stripped" from Unit A as a wholly unsecured loan under § 506, and for DLP and Ragusa to receive payments under the Plan.[39] Over the course of several hearings, and over Russ's opposition,[40] the Court entered interim orders extending the automatic stay to allow Russ and the Court to monitor Debtor's Plan payments.[41]

On August 14, 2019, Debtor filed an Amended Chapter 13 Plan (the "Amended Plan").[42] The Amended Plan changed the treatment of the Russ Note and Russ Mortgage. Rather than stripping the Russ Mortgage lien as provided in Debtor's original Plan, the Amended Plan provided for payments on the Russ Note over five years.

---

[35] Adv. No. 9:19-ap-491-FMD.
[36] Doc. No. 1, pp. 22-25.
[37] Doc. No. 1, p. 49.
[38] Doc. No. 8. Under § 362(c)(3), if the debtor was a debtor in a prior case within the year prior to filing, the automatic stay, unless extended by the bankruptcy court, terminates 30 days after the filing of the second case.
[39] Doc. No. 2.
[40] Doc. No. 13.
[41] Doc. Nos. 15, 16, 31, 52, and 63.
[42] Doc. No. 22.

On September 19, 2019, Debtor filed a Second Amended Chapter 13 Plan (the "Second Amended Plan").[43] In the Second Amended Plan, Debtor proposed to make monthly payments to the Chapter 13 Trustee of $5,158.00 for the first month, $5,761.00 for the second month, and $5,643.00 for months 3 through 60 of the Plan period. In addition to providing for payment of some other creditors, the Second Amended Plan provides for payment of the unpaid balances due to Creditors on account of their secured mortgage claims over the 60 months of the Second Amended Plan with interest at 6% per annum as follows:

　　　　DLP　　　　$72,581.00 @ $1,403.19 per month

　　　　Russ　　　 $95,820.68 @ $1,852.48 per month

　　　　Ragusa　　 $82,522.00 @ $1,595.38 per month.

DLP filed a motion for relief from stay[44] and an objection to the Second Amended Plan, primarily on the grounds that it was not filed in good faith.[45] On December 27, 2019, the Court entered an order extending the automatic stay as to all creditors and denying DLP's motion for relief from stay (the "Stay Extension Order").[46] Under the Stay Extension Order, if Debtor failed to make any Chapter 13 Plan payments when due, DLP could seek expedited relief from stay.

Under the Court's Administrative Order governing procedures in Chapter 13 cases,[47] the Chapter 13 Trustee makes monthly disbursements to secured creditors prior to confirmation if the plan provides for the payments. When the Court entered the Stay Extension Order, the Court contemplated that if the parties were unable to resolve their disputes or Creditors were not satisfied with their receipt of a stream of payments disbursed by the Trustee, Creditors' objections to

---

[43] Doc. No. 39.
[44] Doc. No. 40.
[45] Doc. No. 41.
[46] Doc. No. 68.
[47] Administrative Order FLMB-2018-2, Fifth Amended Administrative Order Prescribing Procedures for Chapter 13 Cases, April 23, 2018.

confirmation of the Second Amended Plan, including objections that Debtor's Chapter 13 case and the Second Amended Plan were not filed in good faith, would be litigated by the parties at a contested confirmation hearing.[48]

### D.    Debtor's Motion to Abate Plan Payments and Third Amended Plan

In March 2020, the impact of the novel coronavirus COVID-19 began to be felt across the country. On April 30, 2020, Debtor filed the Abatement Motion.[49] In the Abatement Motion, Debtor represented that, as a result of COVID-19, neither he nor his wife was receiving income. Debtor requested that his Plan payments be abated for a six-month period, from April through September 2020, and for payments under the Second Amended Plan to be extended from 60 months to 66 months under the "Coronavirus Aid, Relief and Economic Security Act" or the "CARES Act" § 1113(b).[50]

Creditors filed responses to the Abatement Motion and each has sought relief from the automatic stay in the Stay Motions.[51] On May 14, 2020, the Court conducted a telephonic hearing on the Abatement Motion and the Stay Motions and addressed its concern that the Abatement Motion provided for no payments to Creditors during the requested abatement period. The Court continued the hearing to May 28, 2020.[52]

In response to the Court's comments at the May 14 hearing, on May 27, 2020, Debtor filed a Third Amended Chapter 13 Plan (the "Third Amended Plan").[53] The Third Amended Plan reduces Debtor's Plan payments for months eight through twelve of the 60-month Plan period from $5,643.00

---

[48] A continued confirmation hearing is presently scheduled for July 30, 2020 (Doc. No. 81).
[49] Doc. No. 99.
[50] The Court notes that the CARES Act permits Chapter 13 debtors whose plans were confirmed before its enactment on March 27, 2020, to extend their plan payments for up to seven years after the initial plan payment was due. This provision of the CARES Act does not apply to Debtor, whose Plan is not confirmed.
[51] Doc. Nos. 103, 104, and 112.
[52] Doc. No. 108.
[53] Doc. No. 113.

9

per month to $629.00 per month and provides for monthly interest payments to Creditors calculated at 3% per annum.

In other words, under the Third Amended Plan, for the months of April through September 2020, payments to DLP would be reduced from $1,403.19 per month to $182.00 per month; payments to Russ would be reduced from $1,852.48 per month to $240.00 per month; and payments to Ragusa would be reduced from $1,595.38 per month to $207.00 per month.[54]

At the May 28, 2020 hearing, Debtor suggested that payments of 3% interest to Creditors is reasonable given current low interest rates.[55] The Chapter 13 Trustee advised the Court that, thus far, Debtor had paid approximately $45,000.00 to the Trustee under the Plan. Because the Trustee is authorized to distribute payments to secured creditors prior to the confirmation hearing, the Court estimates that the Trustee has paid approximately $14,816.00 to Russ, approximately $12,760.00 to Ragusa, and approximately $11,224.00 to DLP.

### E.  Lack of good faith supports relief from stay, denial of confirmation and dismissal of the case.

In their Stay Motions, Creditor seek relief from the automatic stay under § 362(d)(1), which provides that the court shall grant relief from the automatic stay for cause. "Cause" is not defined in the Bankruptcy Code, and relief from the automatic stay for cause is a discretionary determination made on a case-by-case basis. However, the Eleventh Circuit Court of Appeals has recognized that filing a petition in bad faith justifies the court's granting relief from the automatic stay.[56]

In addition, in order for the Court to confirm a debtor's plan, § 1325(a)(3) requires that the plan be proposed in good faith. And § 1325(a)(7) requires that the action of the debtor in filing the

---

[54] Doc. No. 113, p. 9.
[55] As of June 2020, the U.S. Prime interest rate is 3.25% per annum.
[56] *In re White*, 2014 WL 4443422, at *2 (Bankr. M.D. Fla. Sept. 3, 2014)(citing *In re Dixie Broad, Inc.*, 871 F.2d 1023, 1026 (11th Cir. 1989)(citing *In re Natural Land Corp.*, 825 F.2d 296 (11th Cir. 1987)).

petition must have been in good faith. The good faith requirements of §§ 1325(a)(3) and 1325(a)(7) are two *separate* requirements.[57]

Generally, courts decide questions of good faith on a case-by-case basis under a totality of the circumstances approach. Under this approach, courts consider a number of factors to determine whether a debtor's bankruptcy petition and plan were filed in good faith. The factors include the debtor's motivations in seeking Chapter 13 relief, the frequency with which the debtor has sought relief under the Bankruptcy Code, the circumstances under which the debtor contracted his debts, and the debtor's demonstrated *bona fides,* or lack of *bona fides*, in dealings with his creditors.[58]

If the bankruptcy court determines that a debtor's plan was not filed in good faith, the debtor may be given an opportunity to propose another plan. But if the court determines that the *petition* was not filed in good faith, the court is likely to dismiss the case.[59]

The dismissal of a case for bad faith is consistent with the decision of the United States Supreme Court in *Marrama v. Citizens Bank of Massachusetts*. In *Marrama,* the Court held that a debtor forfeited his right to proceed under Chapter 13 by his prepetition bad faith conduct.[60]

**F.    The record reflects that Debtor's bankruptcy filing and plan lack good faith.**

In considering the factors that courts use to determine whether a bankruptcy case and plan demonstrate good faith, the Court finds as follows:

First, Debtor has availed himself of the jurisdiction of the bankruptcy court nine separate times, and twice within a recent one-year period.

---

[57] *In re Beasley*, 2019 WL 3403361, at *16 (Bankr. N.D. Ala. July 3, 2019)(emphasis added).
[58] *In re Brown*, 742 F.3d 1309, 1316-17 (11th Cir. 2014)(quoting *In re Kitchens*, 702 F.3d 885 (11th Cir. 1983)).
[59] *In re Beasley*, 2019 WL 3403361, at *16(quoting *In re McCreary*, 2009 WL 5215587, at *2 (Bankr. C.D. Ill. Dec. 29, 2009))(emphasis added).
[60] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 127 S. Ct. 1105, 166 L. Ed. 2d 956 (2007).

Second, Debtor has not dealt with Creditors in good faith. For example, Russ made a six-month term loan to Marketking in 2016. Russ alleges that Debtor did not deliver the original Russ Note and Russ Mortgage to him, that Debtor represented that the loan would be secured by a first mortgage on Unit A, and that because Russ could not record the original Russ Mortgage, Debtor was able to obtain a new loan from DLP that was secured by a senior mortgage on Unit A.

The Court recognizes that Debtor may dispute these allegations. But even if the facts do not support Russ's allegations, the record clearly shows that Debtor participated in confusing transfers of Unit A to Crystal Laguna, from Crystal Laguna back to Marketking, and then from Marketking to Debtor himself just two weeks before he filed this bankruptcy case. Further, on the eve of Russ's foreclosure of Unit A, and while Marketking was on title to Unit A, Debtor filed Case No. 9:19-bk-05373-FMD, and despite the fact that Debtor was neither an obligor on the Russ Note nor the owner of Unit A on that date, he filed a suggestion of bankruptcy with the Lee County Circuit Court that resulted in the cancellation of Russ's foreclosure sale. The only explanation for Debtor's actions is that he intended to frustrate Russ's exercise of his foreclosure remedies.

Similarly, in 2019, Debtor engaged in a series of suspect transfers of Unit B, the collateral for the Ragusa Note, by signing deeds to transfer title of Unit B to Level 9, and a month later from Level 9 to Debtor. As with Unit A, the transfer of Unit B to Debtor occurred just two weeks before he filed this bankruptcy case.

Now, Debtor proposes to pay Creditors over five years. In other words, under Debtor's Second Amended Plan, the Russ Note which fully matured in September 2016 would not be paid in full until July 2024. Likewise, the DLP Note and the Ragusa Note, both of which fully matured in 2017, would not be paid in full until July 2024.

In determining whether a petition was filed in bad faith, the real question is whether the petition will lead to a fundamentally unfair result and whether it was filed for a fundamentally unfair purpose.[61] Here, the Court finds that Debtor filed this case for a fundamentally unfair purpose: to delay the payment of Creditors' loans long beyond their maturity dates, after he had already engaged in a series of actions to designed to obfuscate the ownership of Units A and B and to delay Creditors in their foreclosure remedies.

Although issues arising from COVID-19 may have impacted Debtor's ability to make the payments to the Trustee proposed in his Second Amended Plan, the Court finds that there is no equitable basis for the Court to abate Debtor's Plan payments as requested.

### G. Conclusion

For the foregoing reasons, the Court finds that Debtor's petition and the Plans he has filed were not filed in good faith. The Court also finds, first, that cause exists to grant relief from the automatic stay to Creditors under § 362(d)(1), which stay relief is binding upon Debtor and all successors-in-interest; second, that Debtor is unable to propose a plan that satisfies the good faith requirements of § 1325; and third, that the case should be dismissed with a one-year prohibition against refiling. Accordingly, it is

**ORDERED:**

1. Debtor's Verified Motion to Modify Plan to Abate Payments (Doc. No. 99) is hereby **DENIED**.

2. The Court will **GRANT** the Expedited Motion for *In Rem* Prospective Stay Relief filed by Creditor Larry L. Russ, as Trustee for Russ Family Holdings Trust (Doc. No. 103) as set forth above. Counsel for Russ is directed to submit an order.

---

[61] *In re Beasley*, 2019 WL 3403361, at *17.

3. The Court will **GRANT** the Expedited Motion for *In Rem* Prospective Stay Relief filed by Creditor Raymond C. Ragusa (Doc. No. 104) as set forth above. Counsel for Ragusa is directed to submit an order.

4. The Court will **GRANT** the Expedited Motion for Stay Relief filed by Creditor DLP Lending Fund, LLC (Doc. No. 112) as set forth above. Counsel for DLP is directed to submit an order.

5. The Court will **DENY CONFIRMATION** and **DISMISS** this Chapter 13 case as set forth above. Counsel for the Chapter 13 Trustee is directed to submit an order.

The Clerk's Office is directed to serve a copy of this Order on interested parties via CM/ECF.